**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LIFE SCIENCE INSTITUTE, LLC;<br><br>Plaintiff,<br><br>v.<br><br>DAVID SALOFF, LARRY NUSBAUM and QUALITY CONSUMER BRANDS, LLC;<br><br>Defendants. | Case No. 15-cv-03258 (ES-MAH)<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiff Life Science Institute, LLC ("LSI"), for its First Amended Complaint against defendants David Saloff ("Saloff"), Larry Nusbaum ("Nusbaum") and Quality Consumer Brands, LLC ("QCB") (collectively, "Defendants"), states:

**PARTIES**

1. LSI is a limited liability company organized under the laws of the state of Delaware with a principal office at 87 Valley Road, Montclair, New Jersey 07042.

2. Saloff is an individual residing at 1589 Michael Lane, Pacific Palisades, California 90272.

3. Nusbaum is an individual who, upon information and belief, resides at 2323 Race Street, Unit 904, Philadelphia, Pennsylvania 19103.

4. QCB is a corporation organized and existing under the laws of the state of Nevada with its principal place of business at 2721 West Coast Highway, Suite B, Newport Beach, California 92663.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because LSI and Defendants are citizens of different states and the matter in controversy exceeds the sum of $75,000.00.

6. This district is the proper venue for this action pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred here.

## FACTS COMMON TO ALL COUNTS

### Saloff becomes the CEO of LSI

7. LSI is in the business of, among other things, developing, marketing and selling cosmetic health products.

8. Pursuant to a written agreement dated April 1, 2013, LSI hired Saloff to act as its Chief Executive Officer ("CEO").

9. Soon after hiring Saloff, LSI altered its ownership structure and Saloff and his wife each received a 1.5 percent ownership interest in LSI.

10. On August 14, 2013, as part of LSI's ownership change, LSI and Saloff also entered into a new Employment Agreement (the "Employment Agreement") whereby Saloff would continue to serve as LSI's CEO and receive an annual salary of $198,000, plus certain other benefits.

11. In addition to defining the nature of Saloff's employment and compensation, the Employment Agreement provided that:

> [Saloff] shall exclusively devote his professional time to the performance of his duties hereunder. During the Employment Term, [Saloff] shall not engage in professional pursuits other than [Saloff]'s employment hereunder.
>
> . . .

> [Saloff] shall at all times exert his best efforts to promote the success of [LSI] and shall discharge his duties and responsibilities in a trustworthy manner. [Saloff] shall do nothing which will in any way impair or prejudice the name or reputation of [LSI].

12. The Employment Agreement also included a "Non-Compete" provision, which stated that:

> [Saloff] agrees that he will not during the Employment Term and for a period of eighteen (18) months thereafter, directly or indirectly, by any means or device whatsoever for himself or on behalf of or in conjunction with any person or entity, compete with or be engaged in, or participate, directly or indirectly, any business competitive with the business of [LSI].

13. Finally, the Employment Agreement set forth certain "Representations, Warranties, and Covenants" made by Saloff to LSI.

14. As part of the Representations, Warranties, and Covenants in the Employment Agreement, Saloff (i) acknowledged that he "would not receive [an ownership interest in LSI] . . . without [his] agreeing to the terms and conditions of [the Employment Agreement]"; and (ii) represented that:

> [H]e is not a party to or bound by any agreement, arrangement or understanding, written or otherwise, which, directly or indirectly, prohibits or in any manner restricts his ability to enter into and fulfill his obligations under this Agreement and/or to be employed by and serve as an employee of [LSI].

**<u>Saloff simultaneously serves as the CEO of LSI and an LSI competitor</u>**

15. When it first hired Saloff and when it entered into the Employment Agreement, LSI was unaware that Saloff was simultaneously employed as the CEO of Oxis International Inc. ("Oxis"), a California based company that, like LSI, is in the business of developing and selling cosmetic health products.

16. At the time Saloff signed the Employment Agreement, he had no intention of performing his contractual obligations to LSI. Indeed, by virtue of his employment

with Oxis, Saloff was immediately, continually and knowingly in default under the Employment Agreement.

17. As Saloff attempted to juggle his responsibilities as the CEO of two competitive companies, LSI suffered.

18. Not only did Saloff fail to devote the necessary time and attention to LSI's affairs, he used LSI funds to advance his relationships with other Oxis officers. For example, Saloff arranged for LSI to hire a high-ranking OXIS executive to perform consulting services. LSI paid that executive an exorbitant amount of fees, but received almost nothing in return.

19. Although Saloff ultimately resigned as the CEO of Oxis in November 2013, he continued to serve as the Chairman of Oxis's Board of Directors for another eight months.

20. By the time Saloff finally cut his ties with Oxis, LSI was facing financial ruin. Indeed, as a direct result of Saloff's lack of focus and dedication, (i) LSI's major investors lost nearly all of their roughly $7,000,000 capital contribution, and (ii) LSI had no choice but to give up its rights to a significant amount of intellectual property.

21. Just over a year after he signed the Employment Agreement, Saloff was forced to resign as the CEO of LSI.

**Saloff hires Nusbaum**

22. Soon after he became the CEO of LSI, Saloff hired his longtime friend Nusbaum to work as an 'advisor' to LSI.

23. Pursuant to a June 13, 2013 Advisory Agreement (the "Advisory Agreement"), Saloff agreed that LSI would pay Nusbaum a $5,000 a month in exchange

for Nusbaum's performance of certain tasks. For example, Nusbaum was obligated to use his "best efforts" to:

(A) Propose "a direct marketing strategy to [Saloff] which will include potential vendor selections, operational approach, marketing strategy, execution plan with results tracking and metrics".

(B) "Assist [LSI] in the preparation of the short-term budgeting, timeline (Gantt Chart) including recommendations including needs and requirements for implementation."

(C) "Give recommendations concerning the strategies available to Client, evaluation tools and expected outcome."

(D) "Offer advisory services, and appropriate industry introductions to facilitate a targeted media campaign with options such as (direct sales, lead generation, database, multi-pay, two-step phone/mail)."

(E) "Set up (SOPs) standard operating procedures and (KPIs) key performance indicators to help the Client measure and analyze the business."

24. The Advisory Agreement also provided that Nusbaum would report directly to Saloff.

25. Although Nusbaum failed to perform his contractual obligations to LSI, Saloff refused to terminate the Advisory Agreement. Instead, Saloff increased Nusbaum compensation by agreeing to have LSI provide Nusbaum and his family with medical benefits.

**Saloff and Nusbaum conspire to misappropriate LSI products**

26. At the time Saloff became CEO, LSI's founder and Chief Medical Officer, Dr. Vincent Giampapa ("Dr. Giampapa"), had an ongoing business relationship with

Jeunesse, LLC ("Jeunesse"), which also sells various cosmetic products. In addition to acting as a consultant for Jeunesse, Dr. Giampapa was actively seeking to convince Jeunesse to begin selling certain products produced by LSI.

27. Saloff was aware of Dr. Giampapa's relationship with Jeunesse and was even receiving a portion of certain royalties that Jeunesse was paying in connection with Dr. Giampapa's consulting work.

28. In or around December 2013, a dispute arose between Saloff and Dr. Giampapa over the amount of the royalties that Saloff believed he was owed from Jeunesse.

29. That dispute was compounded by Dr. Giampapa's increasingly vocal criticism of Saloff's work as the CEO of LSI.

30. Angry at Dr. Giampapa and realizing that his future at LSI was in jeopardy, Saloff approached Nusbaum with a plan to 'settle the score'.

31. Unbeknownst to Dr. Giampapa or any other LSI employees, Saloff and Nusbaum agreed that they would work together to misappropriate LSI's inventory of certain cosmetic products.

32. To that end, Saloff arranged for LSI to enter into a March 13, 2014 Asset Purchase Agreement (the "Purchase Agreement") whereby LSI agreed to sell its inventory of two skin care products (the "Products") to QCB, a company controlled by Nusbaum.

33. Saloff signed the Purchase Agreement on behalf of LSI.

34. The Purchase Agreement provided that after the closing of the transaction, QCB would pay LSI $37,490.00 in exchange for roughly twenty percent of the Products. QCB would then be obligated to purchase the remaining eighty percent at a cost of

$110,858.12, plus pay an additional $1.00 to LSI for each of the first 100,000 Products that QCB sold.

35. Although the Purchase Agreement contemplated that LSI's first shipment to QCB would include only a portion of the Products, Saloff arranged to have LSI's entire inventory shipped to a warehouse used by Nusbaum. Thereafter, Nusbaum and Saloff began selling the Products through QCB and dividing the profits.

36. To avoid immediate scrutiny from LSI's other officers, Saloff and Nusbaum arranged for QCB to make a payment to LSI in the amount of $37,490.00, which represented the contract price for those Products that Purchase Agreement contemplated would be part of LSI's initial shipment to QCB.

37. Approximately one month after the Products were shipped to QCB, Nusbaum resigned as an advisor to LSI.

38. LSI has demanded payment for the balance of Products it shipped to QCB, but QCB has refused to pay the amount due.

39. Based on the price at which QCB is currently offering the products for sale, Nusbaum and Saloff stand to make a profit of over $1.5 million.

**<u>Saloff begins marketing 'knock off' Jeunesse products</u>**

40. In the fall of 2014, Saloff approached Dr. Giampapa about a new business venture that would involve developing low-cost versions of popular Jeunesse products and selling them in certain Asian markets. Dr. Giampapa made clear to Saloff that participating in the new venture would jeopardize LSI's ongoing efforts to establish a potentially lucrative business relationship with Jeunesse.

41. In spite of Dr. Giampapa warnings, Saloff went ahead with his plan to sell Jeunesse-like products in Asia.

42. As a result of Saloff's actions, Jeunesse backed away from its ongoing negotiations with LSI, and LSI lost out on millions of dollars in potential revenue.

**COUNT I**
**(Breach of Contract as to QCB)**

43. LSI repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

44. QCB's failure to pay LSI for goods sold and delivered pursuant the Purchase Agreement constitutes a material breach of that agreement.

45. As a result of QCB's breach of the Purchase Agreement, LSI has been damaged.

46. QCB is indebted to LSI in the sum of $110,858.12, plus $1.00 per product sold, together with costs.

WHEREFORE, LSI demands that judgment be entered against QCB in the amount of $110,858.12, plus $1.00 per product sold, together with costs and expenses of suit, including, without limitation, reasonable attorneys' fees, and all other legal and equitable relief that the Court may deem appropriate.

**COUNT II**
**(Book Account, in the alternative, as to QCB)**

47. LSI repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

48. As of April 14, 2015, QCB owes LSI the sum of $110,858.12 sold on an open book account.

49. LSI has been damaged in the amount of $110,858.12 through April 14, 2015 as a result of non-payment by QCB on this open book account.

WHEREFORE, LSI demands that judgment be entered against QCB in the amount of $110,858.12, together with costs and expenses of suit, including, without limitation, reasonable attorneys' fees, and all other legal and equitable relief that the Court may deem appropriate.

**COUNT III**
**(Unjust Enrichment, in the alternative, as to QCB)**

50. LSI repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

51. LSI delivered certain cosmetic health products to QCB and demanded payment for those products.

52. Without paying for the products provided by LSI, QCB has gained a benefit from those products, recognized such benefit, and appreciated the gain from such benefit.

53. LSI has demanded payment from QCB, but QCB has wrongfully refused to pay LSI the amount due.

54. By refusing to pay amounts due to LSI for products provided, QCB retained a benefit under circumstances that would be unjust.

WHEREFORE, LSI demands that judgment be entered against QCB in the amount of $110,858.12, together with costs and expenses of suit, including, without limitation, reasonable attorneys' fees, and all other legal and equitable relief that the Court may deem appropriate.

**COUNT IV**
**(Conversion as to all Defendants)**

55. LSI repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

56. Upon information and belief, Defendants have sought and received payment, or will receive payment, from customers who purchased products that were shipped by LSI to QCB.

57. By exercising dominion and control over the products and the sum due and owing to LSI, Defendants have unlawfully converted property of LSI to their financial and pecuniary benefit.

58. Defendants are liable to LSI for all proceeds of such sales, including profits on said sales.

WHEREFORE, LSI demands that judgment be entered against Defendants, jointly and severally, in an amount to be determined at trial, but estimated to exceed $1,000,000.00, together with costs and expenses of suit, including, without limitation, reasonable attorneys' fees, and all other legal and equitable relief that the Court may deem appropriate.

**COUNT V**
**(Civil Conspiracy as to Saloff and Nusbaum)**

59. LSI repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

60. In agreeing to misappropriate certain cosmetic health products from LSI, Saloff and Nusbaum acted in concert to commit an unlawful act, or to commit a lawful act by unlawful means, so as to inflict an injury upon LSI.

61. Arranging for and accepting delivery of products from LSI, Saloff and Nusbaum performed an overt act that resulted in damages to LSI.

WHEREFORE, LSI demands that judgment be entered against Saloff and Nusbaum, jointly and severally, in an amount to be determined at trial, but estimated to

exceed $1,000,000.00, together with costs and expenses of suit, including, without limitation, reasonable attorneys' fees, and all other legal and equitable relief that the Court may deem appropriate.

**COUNT VI**
**(Breach of Contract as to Nusbaum)**

1. LSI repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

2. Nusbaum materially breached the Advisory Agreement.

3. As a result of Nusbaum's breach of the Advisory Agreement, LSI has been damaged.

WHEREFORE, LSI demands that judgment be entered against Nusbaum in an amount to be determined at trial, but estimated to exceed $100,000.00, together with costs and expenses of suit, including, without limitation, reasonable attorneys' fees, and all other legal and equitable relief that the Court may deem appropriate.

**COUNT VII**
**(Breach of Fiduciary Duty as to Saloff)**

4. LSI repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

5. As the CEO of LSI, Saloff had a fiduciary relationship with LSI.

6. By virtue of the conduct described above, Saloff breached his fiduciary duties to LSI, including but not limited to, the duty of loyalty, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of fair, honest dealing, duty of full disclosure, duty to not usurp corporate opportunities for personal gain, and duty of utmost good faith.

7. As a result of Saloff's breaches of his fiduciary duty, LSI has been damaged.

WHEREFORE, LSI demands that judgment be entered against Saloff in an amount to be determined at trial, but estimated to exceed $1,000,000.00, together with costs and expenses of suit, including, without limitation, reasonable attorneys' fees, and all other legal and equitable relief that the Court may deem appropriate.

**COUNT VIII**
**(Breach of Contract as to Saloff)**

1. LSI repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

8. Through the above-described conduct, Saloff's has materially breached the Employment Agreement.

9. As a result of Saloff's breach of the Employment Agreement, LSI has been damaged.

WHEREFORE, LSI demands that judgment be entered against Saloff in an amount to be determined at trial, but estimated to exceed $1,000,000.00, together with costs and expenses of suit, including, without limitation, reasonable attorneys' fees, and all other legal and equitable relief that the Court may deem appropriate.

**COUNT IX**
**(Fraudulent Inducement as to Saloff)**

10. LSI repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

11. Saloff made material representations to LSI, including that Saloff would perform his obligations under the Employment Agreement.

12. Saloff's representations were false, and Saloff made the representations knowing they were false and with the intent that LSI would rely on the false representations.

13. LSI justifiably relied on the Saloff's misrepresentations and suffered injury.

WHEREFORE, LSI demands that judgment be entered against Saloff in an amount to be determined at trial, but estimated to exceed $1,000,000.00, together with costs and expenses of suit, including, without limitation, reasonable attorneys' fees, and all other legal and equitable relief that the Court may deem appropriate.

**COUNT X**
**(Fraudulent Concealment as to Saloff)**

14. LSI repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

15. Saloff concealed from, and failed to disclose to, LSI material facts related to his employment with Oxis and his intent not to perform his obligations under the Employment Agreement (the "Concealed Facts").

16. As the CEO of LSI, Saloff had a duty to disclose the Concealed Facts.

17. Saloff knew that LSI was ignorant of the Concealed Facts and did not have an equal opportunity to discover the truth.

18. By deliberately remaining silent, Saloff intended for LSI to act without the benefit of Concealed Facts.

19. LSI justifiably relied on Saloff's deliberate silence.

20. As a result of Saloff's deliberate silence, LSI was damaged.

WHEREFORE, LSI demands that judgment be entered against Saloff in an

amount to be determined at trial, but estimated to exceed $1,000,000.00, together with costs and expenses of suit, including, without limitation, reasonable attorneys' fees, and all other legal and equitable relief that the Court may deem appropriate.

ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.
*Attorneys for Plaintiff Life Science Institute, LLC*

By: /s/ Matthew Cono Capozzoli
Matthew Cono Capozzoli
875 Third Avenue, 9th Floor
New York, New York 10022
(212) 603-6300

Dated: July 6, 2015